The document below is hereby signed.

Dated: November 10, 2011.



**S. Martin Teel, Jr.**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                          )
                               )
WALKABOUT CREEK LIMITED        )     Case No. 09-00632
DIVIDEND HOUSING ASSOCIATION   )     (Chapter 11)
LIMITED PARTNERSHIP, *et al.*, )     (Jointly Administered)
                               )
          Debtors.             )

<u>MEMORANDUM DECISION</u>

This addresses the reorganization plans submitted by the debtors, Walkabout Creek Limited Dividend Housing Association Limited Partnership ("Walkabout I") and Walkabout Creek II Limited Dividend Housing Association Limited Partnership ("Walkabout II"). This constitutes the court's findings of fact and conclusions of law regarding whether those plans can be confirmed. For the reasons set forth below, I will deny confirmation.

The debtors are affiliated partnerships and the owners of adjacent residential apartment complexes in Dexter, Michigan. Walkabout I's complex consists of 100 units; Walkabout II's

consists of 65 units.  The purchase of the complexes was financed through loans from the Michigan State Housing Development Authority ("MSDHA"), which is the sole secured creditor of the debtors.  Each debtor operates its apartment complex subject to a Regulatory Agreement between the debtor and MSHDA, entered into incident to the purchases of the complexes, and requiring the debtor to rent certain percentages of the units at reduced rents to households whose income is not greater than certain percentages of median income for the area.

The debtors commenced their cases on July 21, 2009, when they filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (11 U.S.C.).  On August 3, 2009, the Court granted the Debtors' Motion for Joint Administration. Thereafter, each debtor submitted as to its proposed plan of reorganization a disclosure statement, which I approved at hearings on December 2, 2009, and January 27, 2010.  On May 5, 2010, the court held a hearing on confirmation of the debtors' plans, at which MSHDA appeared in opposition to confirmation. MSHDA opposes confirmation on three grounds.

I

First, MSHDA argues that the court should deny confirmation because the plans violate the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B).  In support of this argument, MSHDA relies on §§ 5.4 and 5.5 of the plans.  Section 5.4 provides:

2

> All surplus cash, as defined by the MSHDA Regulatory
> Agreement would be deposited as follows: 50% into the
> Replacement Reserve Account and 50% would remain in the
> Operating Account at the end of the fiscal year per the
> annual audit determination for the first three years.
> Any distributions from the Operating Account would be
> subject to the provisions of the Regulatory Agreement.

Section 5.5, in turn, provides:

> Repayment of prior advances from the Partners as
> Unsecured Creditors would be permitted during the first
> three years subject to the terms of the existing
> Regulatory Agreement between the Debtor and MSHDA.  No
> payment of Limited Dividend distributions would be
> permitted during the first three years subsequent to Plan
> Confirmation.

These provisions, MSHDA contends, violate the absolute priority
rule by allowing a distribution to the debtors' equity holders
without MSHDA getting paid in full.  Regardless of whether these
provisions of the plan actually allow for such a distribution,
MSHDA's reliance on § 1129(b)(2)(B) as a basis to deny
confirmation is misplaced.

Section 1129(b)(2)(B) allows the court to confirm a plan
over the vote of a non-consenting class of unsecured creditors if
the plan meets two conditions.  The threshold inquiry to bring
this provision into operation, however, is whether there is a
non-accepting class of unsecured creditors.  Here, MSHDA is the
only creditor that voted against the plans.  In each case,
however, MSHDA's claim, as conceded by both the debtors and
MSHDA, is fully secured.  All the voting unsecured creditors, in
contrast, voted in favor of the plan.  Without a non-accepting

class of unsecured creditors, the debtors need not rely on the cramdown provision of § 1129(b)(2)(B), and, therefore, the absolute priority rule is no bar to confirmation.

II

Second, MSHDA argues that the court should deny confirmation because each debtor has not met the cramdown requirements of 11 U.S.C. § 1129(b)(2)(A) with respect to its class. Under each plan of reorganization, the debtor placed MSHDA in its own class, listed the claim as a fully secured, and provided for the re-amortization of the outstanding balance of the claim over a period of 35 years, at a rate of 5% with payments of only interest for the first three years. MSHDA has not accepted either of the plans.

Under § 1129(b)(2)(A), the court may confirm a plan over the vote of a non-consenting class of allowed secured claims if one of three conditions are met. Here, each debtor is seeking to invoke the "cram down" power of § 1129(b)(2)(A)(i), which allows confirmation if the plan provides that MSHDA retain its lien and receive deferred cash payments totaling the present value of its claim. Under this provision, MSHDA argues that cramdown is inappropriate because the 5% interest rate proposed by the debtors in the plans is insufficient to meet the present value requirement of § 1129(b)(2)(A)(i)(II).

4

A.

As to the appropriate interest rate under

§ 1129(b)(2)(A)(i)(II), the Supreme Court's decision in *Till v.*

*SCS Credit Corp.*, 541 U.S. 465 (2004), a case addressing an

identical cramdown provision under Chapter 13 of the Bankruptcy

Code, provides the court with a starting point.  In *Till*, the

Supreme Court addressed the present value requirement of 11

U.S.C. § 1325(a)(5)(B)(ii) for cramdown of a secured claim

through a plan under Chapter 13.  There, the Court evaluated four

different methods courts had used to determine whether an

interest rate proposed by a debtor in a Chapter 13 plan was

appropriate under § 1325(a)(5)(B)'s cramdown provision: the

coerced loan rate, the presumptive contract rate, the cost of

funds rate, and the formula rate.

Under the coerced funds rate, courts "treat any deferred

payment of an obligation under a plan as a coerced loan and the

rate of return with respect to such loan must correspond to the

rate that would be charged or obtained by the creditor making a

loan to a third party with similar terms, duration, collateral

and risk."  *In re American Homepatient, Inc.*, 420 F.3d 559, 565

(6th Cir. 2005) (citations omitted).  Moreover, in determining

the appropriate interest rate, courts "consider evidence about

the market for comparable loans to similar (though nonbankrupt)

debtors."  *Till*, 541 U.S. at 477.  The *Till* Court, however,

5

rejected this approach because it was "far removed from such courts' usual task of evaluating debtors' financial circumstances and the feasibility of their debt adjustment plans" and because "the approach overcompensates creditors because the market lending rate must be high enough to cover factors, like lenders' transaction costs and overall profits, that are no longer relevant in the context of court-administered and court-supervised cramdown loans." *Id.*

The Court likewise rejected the presumptive contract rate approach. Under the presumptive contract rate approach, the court simply presumes that the original rate at which the creditor loaned the funds is the appropriate rate, but can revise the rate on the motion of either party. *Id.* at 492 (Scalia, J., dissenting). The Court decided against this approach because it "produces absurd results, entitling inefficient, poorly managed lenders with lower profit margins to obtain higher cramdown rates than well managed, better capitalized lenders" and "because the approach relies heavily on a creditor's prior dealings with the debtor, similarly situated creditors may end up with vastly different cramdown rates." *Id.* at 478 (internal quotation marks omitted).

Finally, the Court also rejected the cost of funds approach. Under this method, "courts focus on the characteristics of the creditor, and its ability to obtain the capital needed to lend."

6

7 Collier on Bankruptcy ¶ 1129.05[2][c][ii][A].  In other words,
courts look at how much it would cost the creditor to obtain the
funds it would otherwise receive were it to liquidate the
collateral securing the loan.  *See General Motors Acceptance
Corp. v. Jones*, 999 F.2d 63, 67 (3d Cir. 1993).  The Court
rejected this approach because "it mistakenly focuses on the
creditworthiness of the *creditor* rather than the debtor,"
"imposes a significant evidentiary burden, as a debtor seeking to
rebut a creditor's asserted cost of borrowing must introduce
expert testimony about the creditor's financial condition," and
it allows "a creditworthy lender with a low cost of borrowing
[to] obtain a lower cramdown rate than a financially unsound,
fly-by-night lender."  *Till*, 541 U.S. at 478.

Having rejected the three methods outlined above, the *Till*
Court settled on the formula approach.  Under the formula
approach, a court is to look to the national prime rate available
to a creditworthy commercial borrower and adjust it upward to
account for the greater default risk presented by debtor in
bankruptcy. *Id.* at 479.  The Court stated that "[t]he appropriate
size of that risk adjustment depends, of course, on such factors
as the circumstances of the estate, the nature of the security,
and the duration and feasibility of the reorganization plan."
*Id.*  The Court opted for this prime-plus approach because the
prime rate was readily determinable, presented lower evidentiary

7

requirements, and focused on the circumstances of the debtor,
which is more within the bankruptcy court's expertise. *Id.* at
479.

Although *Till* is clear that bankruptcy courts should apply
the formula approach in the Chapter 13 cramdown context, the
Court is less clear on how courts should go about determining the
relevant cramdown rate in Chapter 11 cases.  At one point, the
Court noted that it was "likely that Congress intended bankruptcy
judges and trustees to follow essentially the same approach when
choosing an appropriate interest rate under any of [the cramdown]
provisions." *Id.* at 474.  In a footnote, however, the Court at
least partially undercut this clear statement:

> This fact helps to explain why there is no readily
> apparent Chapter 13 "cram down market rate of interest":
> Because every cramdown loan is imposed by a court over
> the objection of the secured creditor, there is no free
> market of willing cramdown lenders.  Interestingly, the
> same is *not* true in the Chapter 11 context, as numerous
> lenders advertise financing for Chapter 11 debtors in
> possession. . . . *Thus, when picking a cramdown rate in
> a Chapter 11 case, it might make sense to ask what rate
> an efficient market would produce.*  In the Chapter 13
> context, by contrast, the absence of any such market
> obligates courts to look to first principles and ask only
> what rate will fairly compensate a creditor for its
> exposure.

*Id.* at 476 n.14 (second emphasis added).  Keying off this
language, the Sixth Circuit has developed an approach to
determining cramdown rates in Chapter 11 cases.

In *Bank of Montreal v. Official Committee of Unsecured
Creditors (In re American Homepatient, Inc.)*, 420 F.3d 559 (6th

8

Cir. 2005), the Sixth Circuit Court of Appeals determined that
"the market rate should be applied in Chapter 11 cases where
there exists an efficient market.  But where no efficient market
exists for [] Chapter 11 [debtor-in-possession financing], then
the bankruptcy court should employ the formula approach endorsed
by the *Till* plurality."  *Id.* at 568.

B.

Under the *American Homepatient* test, the threshold issue,
then, is whether an efficient debtor-in-possession financing
market exists for multi-family residential projects.  In this
regard, two pieces of evidence are relevant.

1.  <u>MSHDA's Evidence</u>.  MSHDA presented evidence at the
hearing that the cost to issue bonds on the market to finance the
re-amortization of the debtors' loans is 5.25%.  Assuming without
deciding that the market onto which MSHDA sells its bonds is
efficient, this would still not provide the court with the
relevant cramdown rate.

The record does not show the character of the bonds MSHDA
issues.  The 5.25% rate could be a general obligation of MSHDA
or, alternatively, could be only collateralized by the underlying
mortgages (or payment streams stemming from those mortgages),
neither of which alternative represents the efficient rate for
debtor-in-possession financing for multi-family residential
developments.

9

If the bonds are merely general obligations of MSHDA and not collateralized by the underlying mortgages, 5.25% solely represents MSHDA's creditworthiness, and does not speak to a market for debtor-in-possession financing on multi-family residential developments.

Alternatively, even if the MSHDA bonds were collateralized only by the underlying mortgages, and therefore more likely the efficient rate for multi-family residential mortgages, 5.25% only represents the coupon rate of the bonds, and not the yield, which would provide a more accurate picture of the efficient rate: the public might buy the bonds at a discount or at a premium, and the resultant actual yield would be different from the coupon rate.[1]

Even if the coupon rate is collateralized only by the underlying mortgages, and the court were presented with evidence of the yield rate on the MSHDA bonds, that rate would still not represent the efficient rate for debtor-in-possession financing on multi-family residential projects because that rate would represent a blended, diversified rate of all the MSHDA projects

---

[1]   For example, assume MSHDA sells bonds with a 5.25% coupon rate and a face value of $1,000.  When MSHDA tries to place those bonds on the market, however, investors might look at the underlying mortgages and determine that 5.25% is insufficient to compensate them for the risk associated with that collateral. Accordingly, the underwriter might only be able to sell these mortgages to investors at a discount of $50 off the face value. This would lead to a yield of 5.526% on a bond with 35 years to maturity.  This yield rate, as opposed to the coupon rate, would be the actual efficient rate for lending on multi-family residential units.

securing the bonds.  The actual efficient rate for the debtors'
projects could, in fact, be lower (if, for example, the debtors
were operating in a superior locality in terms of, *e.g.*, tenant
vacancy rates in comparison to other projects) or higher (because
the debtors are debtors in bankruptcy) than the effective yield
rate on the bonds.

For these reasons, the mere fact that MSHDA would offer
bonds at 5.25% does not establish an efficient market rate for
multi-family residential projects.

2.  The Debtors' Evidence.  The debtors presented expert
testimony at the hearing regarding interest rates offered by
state housing finance agencies and HUD/FHA mortgage insurance
programs.  Two of the rates presented were for a proposed MSHDA
refinancing of a 152-unit project in Kentwood, Michigan and for a
proposed MSHDA construction financing on a 147-unit elderly
housing project located in Royal Oak, Michigan.  Additionally,
the debtors presented rates from FHA-insured loans in Michigan
and Virginia and the current rates offered by Freddie Mac and
Fannie Mae.

The last three loans do not represent the market under which
these debtors would seek financing and, accordingly, are
irrelevant to my analysis.  The debtors' properties, its expert
admits, would not meet the current underwriting standards for
either Freddie Mac or Fannie Mae loans, and, accordingly, these

11

loans do not factor into the analysis of whether there is an efficient market.  Moreoever, the FHA-insured loans likewise fail to establish the market precisely because they are FHA-insured. Comparing the debtors' mortgages to FHA-insured loans is akin to comparing a standard residential mortgage to a VA mortgage: the VA-backed financing only establishes the rate for VA-insured loans, not the market for all mortgage loans.  Because there was no evidence that the debtors' mortgages would or could be FHA-insured, these mortgages also fail to establish the efficient rate for the debtors' loans.

Moreover, although closer to the mark, the two MSHDA loans presented by the debtors' expert likewise also fail to establish the efficient market lending rate for multi-family residential project mortgages.  First, the first-mortgage interest rate of 6.75% does not represent the efficient rate because it merely represents the coupon rate of 5.25% plus the 1.5% allowed by the Internal Revenue Service for the bond to remain tax exempt.  For the reason stated above, basing the rate off the 5.25% coupon rate is problematic because that rate could either represent MSHDA's creditworthiness or would otherwise be inefficient because it is not the yield rate.  Second, the expert's evidence of the actual effective rate of the two MSHDA loans also fails to establish the market because it takes into account "soft" second mortgages with reduced or no interest, section 1602 funds with no

12

interest and forgiveness options, and additional funds from new
tax credits.  The debtor presented no evidence that these
additional funds, which result in a lower, effective interest
rate, would be available to it.  Without this information, the
two MSHDA loans also fail to establish the efficient market.

C.

Having found an absence of evidence that an efficient market
exists, I turn to the formula approach adopted by the Court in
*Till*.  In *Till*, the plurality opinion held that bankruptcy courts
should take the prime lending rate published in newspapers daily
and then add a risk factor.  The Court noted that generally
bankruptcy courts employing the formula approach have added a
risk adjustment of between 1-3%.

1.  The Starting Interest Rate

Here, though, I do not believe the prime rate is the
appropriate starting point.  The prime rate represents "[t]he
interest rate that a commercial bank holds out as its lowest rate
for a short-term loan to its most creditworthy borrowers."
*Blacks Law Dictionary* 888 (9th ed. 2009).  In *Till*, the court was
addressing the cramdown of a car loan under a plan that called
for payments to be made over a three-year period.  A chapter 13
plan cannot provide for payments of a duration of longer than
five years by reason of 11 U.S.C. § 1322(d)(2)(C).  The debtors'
plans, however, propose to re-amortize the loans over a period of

35 years, representing greater inflationary risk than the prime
rate accounts for.  A possible starting point is the 30-year
treasury yield, which I take judicial notice of.  Around the time
of the confirmation hearing, that rate was 4.24 percent.

Unlike a prime rate, however, a 30-year treasury yield does
not include the average adjustment made by lenders in arriving at
a prime rate for the costs of administering the loan.  In other
words, it is appropriate to take into account the costs of
administering a loan that as an objective matter it would be
expected a creditor would incur in administering a hypothetical
loan of this character.  A loan of this character is not the
equivalent of a Treasury bond where minimal costs of
administration are required because the payments come in like
clockwork, and there is no need for periodic inspection of the
debtor's property to assure that it is being kept in sound
condition.  Nor is it the equivalent of a short-term prime loan
where the costs of monitoring performance are minimal in
comparison to a loan secured by a large multi-family apartment
building.  Accordingly, the 4.24% figure is actually too low as a
starting point.

The parties presented no clear evidence regarding the costs
of monitoring performance.  Jeffrey John Sykes of MSHDA testified
that if the debtors' plans were confirmed, MSHDA would have to
pay off the bonds on the existing debt.  If new bonds were

14

floated by MSHDA to cover the amounts being financed under the

debtors' plans, Sykes testified, MSHDA would fix the bond at

5.25% (MSHDA's cost of funds) plus a spread of 1.5% for a total

of 6.75%.  He explained that:

> whenever we enter into a bond issue, one of the key
> documents that's a part of that bond issue is what's
> called a non-arbitrage certificate and . . . what the
> I.R.S. is saying . . . in this non-arbitrage certificate
> is that you're not to make money.

Under the Internal Revenue Service rules regarding non-arbitrage

bonds, he explained:

> the spread is the amount that you can earn to cover the
> costs of paying for the administration of that bond
> issue.  There's costs to remarketing agents, there's
> costs of staff to cover the administration of the
> mortgages so it's the I.R.S. that came to the conclusion
> that the one and a half is what it costs to  administer
> one of these programs.

The costs of remarketing agents are transaction costs that *Till*

holds are not an appropriate consideration in arriving at a

present value interest rate.[2]  Accordingly, the 1.5% spread
cannot be used as the appropriate adjustment to the starting
treasury interest rate to account for costs of administering the
loan, as the portion of the 1.5% attributable to remarketing
would have to be removed.  Nevertheless, as the record in this
case amply demonstrates, the extent of monitoring required of
this type of loan is not insignificant, and thus the interest
rate adjustment to reflect the costs of administering the loan
would not be insignificant.

Moreover, the debtors' plans call for payment of interest
only for the first three years of the plan.  Loans containing an
interest only provision command a higher interest rate than loans
calling for amortization of principal from the outset.  This is a

---

[2]  The debtors contend that the 1.5% spread is not always
the amount of administration costs incurred: if MSHDA operates
more efficiently, it may have surplus funds available for other
purposes.  Nevertheless, *Till* teaches that the efficiencies of
the affected creditor versus the overall efficiency of all
lenders ought not be controlling.  *Till*, 541 U.S. at 476-77,
observing that:

> a court choosing a cramdown interest rate need not
> consider the creditor's individual circumstances, such
> as its prebankruptcy dealings with the debtor or the
> alternative loans it could make if permitted to
> foreclose.  Rather, the court should aim to
> treat similarly situated creditors similarly, and to
> ensure that an objective economic analysis would
> suggest the debtor's interest payments will adequately
> compensate all such creditors for the time value of
> their money and the risk of default.

[Footnotes omitted.]

second reason why the 4.24% figure is too low as a starting
point.

Finally, the debtors' plan call for a 35-year repayment
period whereas the 4.24% figure is for a 30-year treasury bill.
Obviously the inflation and risk adjustments for a 35-year loan
are greater than for a 30-year loan.  For this third reason, the
4.24% figure is too low as a starting point.

          2.   The Risk Premium Adjustment to be
               Added to the Starting Interest Rate

After arriving at a relatively risk-free starting interest
rate, the *Till* plurality directs the bankruptcy court to add in a
risk adjustment premium that "depends, of course, on such factors
as the circumstances of the estate, the nature of the security,
and the duration and feasibility of the reorganization plan."
*Till* 541 U.S. at 479.  The Court further goes on to direct
bankruptcy courts to "hold a hearing at which the debtor and any
creditors may present evidence about the appropriate risk
adjustment" but also notes, importantly, that "[s]ome of this
evidence will be included in the debtor's bankruptcy filings . .
. ."  *Id.*  Moreover, at this hearing the "evidentiary burden
[rests] squarely on the creditors, who are likely to have readier
access to any information absent from the debtor's filing (such
as evidence about the 'liquidity of the collateral market')." *Id.*

17

(citations omitted).[3]

Till was a chapter 13 case involving a consumer debtor. In a chapter 11 case, a sophisticated chapter 11 debtor, in the business of operating a large multi-family apartment project, may be no less likely than a public housing authority to have ready access to information regarding an appropriate risk adjustment. In contrast to a chapter 13 consumer debtor, the debtors here, as proponents of plans addressing secured claims against large multi-family projects, arguably ought to bear the burden of proof. Nevertheless, I need not reach that issue.

In contrast to a chapter 13 case, the pendency of these debtors in bankruptcy cases does not materially lessen the risks MSHDA will face with respect to the re-written loans. The Court in Till pointed to the bankruptcy court's supervision of a chapter 13 plan as a reason why the risks to the lender were reduced, stating "the postbankruptcy obligor is no longer the individual debtor but the court-supervised estate, and the risk of default is thus somewhat reduced." Till, 541 U.S. at 475 (footnote omitted). In this case, however, the debtors' future income will not be paid (as occurs in a chapter 13 case) to a

---

[3] Although the plurality opinion in Till was not joined by the concurring opinion on this issue of burdens of proof, the concurring opinion thought that no interest rate need be added to payments of a secured claim under a plan. Necessarily, the result is that the best a creditor can hope for under Till is the plurality opinion's approach regarding the issue of burdens of proof.

trustee as necessary for execution of the plans.  Moreover, both
inside and outside of bankruptcy, mortgages of this size are
subject to a high level of scrutiny regarding the debtor's
financial circumstances and performance in maintaining the
collateral.  There is no reason to think that the risks the
debtors' plans present are any different than the risks outside
of bankruptcy for any other borrower under a loan to fund the
acquisition or retention of large multifamily apartment
complexes, all other things being equal.

The parties only presented limited evidence at the
confirmation hearing regarding the risk of default in these
reorganizations.  John Freeman, the president of the managing
general partner of the debtors, testified that Michigan has been
particularly hard hit over the past few years by recession, with
an unemployment rate of 15%.  This resulted in properties
experiencing more serious financial difficulties.  Freeman
further testified that the projects have between a 93%-98%
occupancy rate and that the debtor had several critical deferred
maintenance items since 2008.  The debtors' plans provide to set
aside $1,000 per unit for the first three years and $500 per unit
thereafter to meet ongoing capital expenditure requirements and
to place one-half of the debtors' net income into replacement
reserves for the first three years of the plan.  Moreover, MSHDA
presented evidence through Craig Torres that the properties were

19

in fair condition, but some items required repair.  Amy Rollis testified that she was satisfied with the current management of the property.  Furthermore, Steve Lathom testified, for example, that utilizing the debtors' seven-year history for calculating expenses, the debtors would be operating at a deep negative cash flow at the 20-year mark.  MSHDA presented no evidence on the costs it would incur were it to have to foreclose on the property, including evidence on the liquidity of the collateral market (factors that *Till* deemed pertinent).

The Court in *Till*, 541 U.S. at 480, noted that courts following the formula approach have generally fixed the risk premium at 1% to 3%.  That, of course, is just an observation devoid of any discussion of the facts of the cases in which generally such an adjustment was made.  It is not even *dicta*, and certainly not binding precedent.  The difficulty is that the Court gave little guidance as to how a risk premium *number* is to be arrived at after a bankruptcy judge fully considers all the factors that bear on risk.  Although the Court in *Till* listed some factors a bankruptcy court should consider in arriving at a risk adjustment, the Court gave no explanation for how bankruptcy courts are supposed to *quantify* a risk adjustment after considering those factors.  Although the Court observed that "many of the factors relevant to the adjustment fall squarely within the bankruptcy court's area of expertise," *Till*,

20

541 U.S. at 479, that is because bankruptcy judges are required

to determine whether it is more likely or not that a plan will

fail.  The Court did not state, however, that bankruptcy judges,

after examining the risk factors, have any expertise in

quantifying a risk premium based on those factors.

Commercial lenders build a risk premium into their interest

rates based on their experience in dealing with loans over a long

period of time.  In contrast, most bankruptcy judges have only

limited familiarity with how often a loan goes into default based

on its risk features, and even though they can arrive at a rough

estimate of a percentage likelihood of default, have no training

in quantifying that into a risk premium number to be added to a

relatively risk-free starting point.  When a bankruptcy judge

picks a risk premium number, unless expert testimony regarding

the components of market interest rates is presented, it may be

guesswork that would not pass muster under the standards

applicable to expert witnesses.  That is why the coerced loan

approach to fixing interest rates for present value purposes,

based on what are prevailing market rates, was generally easier

of application than has been the *Till* formula approach.

Market rates of interest include a built-in component for

profit, and profit is necessarily part of the value that a lender

hopes to achieve in lending.  When, via cramdown, a lender is

denied any profit, that deprives the lender of the value it could

achieve from putting out loans at market rates of interest. Nevertheless, *Till* viewed profit as unnecessary to assure present value under its formula approach, as though "profit" were a dirty word, and even though the prime rate that *Till* used as a starting point necessarily includes some element of profit.  If profit is to be disregarded in arriving at a cramdown interest rate, the task of separating out the profit component from market rates of interest, in order to arrive at only a risk component, may be quite difficult.

In addition, *Till* viewed transaction costs as a component of market rates of interest that ought not be included in a present value calculation under the Bankruptcy Code.  Transaction costs are frequently paid by a borrower at closing (that is, are frequently not paid for via the interest rate charged), and even when they are included in the interest rate are probably minimal. In any event, the transaction costs a secured lender incurs in monitoring a bankruptcy confirmation process in a chapter 11 case are probably at least as significant, or more so, as would occur in making a loan.

Necessarily, under the *Till* formula approach, a bankruptcy judge might look to the real world of market rates and attempt to divine what part of market rates represents a risk premium component, but market rates of interest are not nicely broken down in the *Wall Street Journal* as to their various components

22

for such things as risk, transaction costs, costs of administration, and profit.  In many cases, bankruptcy judges probably mouth the words of *Till* regarding risk factors and after addressing those factors act as though they have the expertise to *quantify* a risk premium based on those factors just because *Till* suggests that they do, and because they are obedient soldiers in the field struggling to obey the Court's precedent.  At some point, a case will arise in which, after reviewing the various risk factors a plan presents, and without any expert testimony as to the components (including the risk component) of market rates of interest or other expert testimony regarding quantifying a risk component, a judge will arrive at a risk premium adjustment that is necessarily guesswork.  In such a case, a litigant might well remark that the bankruptcy judge is engaged in a naked exercise, unsupported by any evidence, of pulling a number out of thin air, and state the equivalent of "The emperor has no clothes."

   3.  Arriving at a Final Figure
       Under the *Till* Formula Approach

Here, the debtor has attempted to depart from the formula approach and to seek to fix the plans' interest rate based on prevailing market rates of interest, which would usually result in a higher rate of interest than the *Till* formula approach.  The record contains evidence of market rates of interest, but such evidence is generally of federally insured mortgages in which the

23

lender would not be addressing risk in fixing the interest rate.
It is thus necessary to resort to the *Till* approach.  Weighing
all of the evidence and even assuming that under *Till*, the burden
of demonstrating the risk adjustment ultimately rested with
MSHDA, I find that the appropriate upward adjustments to the
4.24% 30-year treasury yield (specifically, adjustments for risk,
for costs of administration, for the provision for payment of
interest only for the first three years of the plan, and for the
35-year period of the plan versus the 30-year treasury period) is
*at least* 1%, bringing the total rate to *at least* 5.24%, which, I
note, is consistent with the range of rates the debtors' expert
testified represented the market rate for non-debtor-in-
possession financing on multi-unit residential projects for 25-
to 35-year amortization periods.  Because the debtors' plans only
offer a rate of 5%, MSHDA's objection to confirmation under
§ 1129(b)(2)(A)(i)(II) is well taken, and denial of confirmation
on this basis is appropriate.

D.

The foregoing analysis is unaltered by the debtors'
argument, which I reject, that the proposed interest rate under
their plans is effectively higher than the face amount.  At the
trial, the debtors presented evidence showing that by reason of
being required by the Regulatory Agreement to rent some of the
units at below-market rents, the debtor would effectively be

24

paying a greater interest rate with respect to those units than

it would if it were able to rent the units at market rates.

Nevertheless, the debtors acquired the complexes with full

knowledge that the rents that could be charged on those units

were required by the Regulatory Agreement to be rented at below-

market rents.   The debtors are no different than any other debtor

who acquires properties that are handicapped by some regulatory

requirement, such as a restrictive zoning requirement that limits

the number of parking spaces and thus reduces the rents that can

be charged.   Such a restriction may affect the value of a

debtor's property, and thereby affect the amount of the

creditor's allowed secured claim, but the parties here have no

dispute regarding the value of the debtors' properties.   Such a

restriction does not affect the interest rate question (other

than bearing on the risk factor of the feasibility of a debtor's

plan).   The critical question is what is a fair rate of interest

to assure present value to the lender for the amount of its

allowed secured claim, not to adjust that rate based on a

consideration of what rents the debtor could achieve if the

regulatory restrictions, under which it acquired the property,

were not in place.

III

    Finally, MSHDA argues that the court should deny

confirmation under § 1129(a)(11), which allows a court to confirm

25

the plan only if it finds that confirmation of the plan is not likely to be followed by "the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan . . . ." Particularly, MSHDA contends that the debtor will have insufficient cash flow to provide for its ongoing capital expenditure needs over the course of the plan.

As evidence of feasibility, the debtor prepared 10-year projected budgets for the properties. The budgets began with 2010 baseline income and expense figures, which the debtors derived from actual 2009 expenses and incomes. The debtors then carried these numbers out over a 10-year period, assuming no revenue growth in years 1-3 and 1% per year growth in years 4-10, and assuming a 2% per year increase in expenses over the period.[4] Furthermore, the projected budget included replacement reserve funding of $1,000 per year per unit for years 1 through 3, and $500 per year per unit for years 4 through 10 and projected mortgage expenses over the period, with years 1 through 3 being interest only and years 4 through 10 with payments of interest and principal on the mortgage over an amortization period of 35 years at 5%. As I stated above, however, 5% is too low. That necessarily results in less funds being available for capital

---

[4]     After year 10, the debtor projects both income and expenses to increase at the rate of inflation.

expenditures if at least a 5.24% interest rate is used than would be the case using the debtor's proposed 5% interest rate.

There are several relevant pieces of evidence that bear on whether the amounts that would be available for capital expenditures using a 5.24% cramdown rate of interest (or the amounts that would be available even using the 5% cramdown rate of interest proposed by the debtor) are sufficient to meet the debtors' capital expenditure requirements over the course of the plan.

First, the debtors' interest rate expert, Donald Marshall, stated in his report that "Contributions to replacement reserves of $1,000 per unit per annum for the first 3 years and $500 per unit per annum thereafter are appropriate for funding ongoing capital improvements for a property of this character."  I give little weight to this testimony, however, as Marshall is only an expert in interest rates, not replacement reserves, and, in any event, Marshall had never visited the properties to determine whether these properties might require more than the standard contributions to replacement reserves.

Second, the president of the debtors' managing member, John Freeman, testified that he believed that "going forward with the projected contributions to the replacement reserve and the projected debt service coverage that we will have sufficient funds to operate and maintain these properties for the

27

foreseeable future."  The only support for this otherwise
conclusory statement, though, are the capital expenditure
statements for 2008, 2009, and the first half of 2010 for each of
the properties.  But, even if I were to take those figures (less
non-recurring expenditures like asphalt, concrete, and fire
restoration expenses) and project them out over the course of the
plan at the debtors' 2% increase rate for the first ten years,
there was no evidence that these expenses were typical for these
types of properties or represented an amount that would be
sufficient to meet the ongoing capital expenditure requirements
of the properties going forward.  Indeed, Donna McMillan, MSHDA's
Director of Asset Management, testified that it was not logical
that the debtor had failed to include any expenses as far as
repairs and maintenance on the property and that she would expect
to see this in the debtors' proposed budget.  Accordingly, even
though Freeman was a credible witness, without further supporting
evidence, I give little weight to Freeman's conclusory testimony
that the funds available for capital expenditures over the course
of the plan will be sufficient to ensure the viability of the
properties for the next 35 years.

Finally, Steve Lathom, an employee in MSHDA's multi-family
finance area, also testified that he ran projections based on the
debtors' submission to MSHDA of its 2010 projected budget for
capital needs and other expenditures.  The result of these

projections, Lathom testified, was a negative cash flow within 3 to 5 years of confirmation of the plan, with the plan being deeply negative when projections are made for a 20-year period. The problem with this projection testimony, however, is that 2010 capital expenditures might over-represent the future capital expenditure requirements of the property over the course of the plan.  Freeman testified without contradiction that the 2010 budget included several big ticket capital expenditure items. Lathom also testified, though, that he had made another projection based on a seven-year average of capital expenditures on the properties, with the same net result.  Although Lathom was a credible witness and I give this projection based on a seven-year history more weight than the other projection (which was based solely on the 2010 budgeted expenditures) because it relies upon historical data for a longer period of time, the weight I accord this projection is entitled to less weight than it would be otherwise because MSHDA failed to present the actual projections spreadsheets to the court or the underlying data on

which those projections rely.[5]  The debtor failed to do
projections for the plan showing specific annual capital
expenditures as line items, and it is the debtor, not MSHDA that
bore the burden of showing feasibility.

Ultimately, however, my decision comes down to burdens of
proof.  The burden of demonstrating feasibility under
§ 1129(a)(11) rests with the debtor, who must show that it is
more likely than not that the debtor's plan will not be followed
by "the liquidation, or the need for further financial
reorganization, of the debtor or any successor to the debtor
under the plan . . . ."  In light of the conclusory nature of
Freeman's testimony, my decision to give little weight to
Marshall's testimony as it relates to capital expenditure reserve
requirements, and my decision to give some weight to Lathom's
projection testimony based on a seven-year average of capital
expenditures, the debtor has at most shown that it is at least

---

[5]  The debtor pointed to an error in the projection that was
based on the 2010 budget.  That projection included a line item
for premium management fees (*e.g.*, $4,485 per year for Walkabout
II).  The debtor and the management company, however, have agreed
that such a premium would be paid only if the debtor had
distributable income (necessarily meaning that expenses of
operation, including debt service, had been met).  Accordingly,
that item ought not be included in a risk analysis.  Assuming
that Lathom's projection  based on a seven-year history of
capital expenditures included a management premium (a non-capital
expenditure), Lathom's testimony was that the projection showed
the debtor as being in negative territory within three to five
years, and in severe negative operation territory over a twenty-
year period: elimination of the management premium would not
likely have been enough to overcome that severity.

30

equally likely that this plan will not be followed by liquidation or a subsequent reorganization.  Because the debtor has failed to carry its burden in this regard, I will also deny confirmation based on lack of feasibility.

IV

An order follows denying confirmation of the debtors' plans.

[Signed and dated above.]

Copies to: Recipients of e-notice.